And we'll now call the case of the United States versus Kerry Woods, Mr. John Baptiste. Good afternoon, Your Honors. Darren John Baptiste on behalf of Appellant Kerry Woods. If it pleases the Court, Your Honor, I would request two minutes for rebuttal. At request will be granted. I would like to start off by addressing the issue I raised with respect to the Court's admission into evidence, evidence of the September 20, 2003 drug seizure. I believe in this case that the Court's decision to admit that evidence into evidence was indeed incorrect, Your Honor, and that my client did suffer prejudice. The fact that my client has a chorea, the evidence was that my client was a chorea and that he took perhaps three travels to North Carolina, where in each instance he supposedly carried 10 kilograms of cocaine. Now, although I never raised that issue with respect to his sentence, my client, because of that, you know, was facing an enhancement based upon the 30 kilograms of cocaine that the testimony of Glenson Isaac and Ms. Wright was in the case. Now, it's important to note that other than this September 20, 2003 drug evidence, there was no other evidence of cocaine admitted into the Court, and that the testimony of the government's witnesses, Mr. Isaac, was that in each instance 10 kilograms was being transported from St. Thomas on the Virgin Islands to North Carolina. His testimony was that the drugs came to North Carolina by way of carry-on luggage. The September 20, 2003 drug seizure, according to testimony of the government's three key witnesses as it pertains to that evidence, was that agents at the airport discovered two bags. On one hand, there was testimony that the bags were tagless bags that were to be checked onto the airline. On the other hand, I think it was Agent Peake testified that the bags that were discovered had bag tags, but nonetheless it was also destined to be checked bags. Now, the testimony of Mr. Isaac, as well as the testimony from Mr. Springett, was that the methodology that they always used was never anything involving bag tags or whatnot, but perhaps in one instance there was a methodology where they switched bags, where bags would be placed either in the ceiling of the airport the night before or it would be placed in a locker, and then subsequently an individual would come into the airport, clear customs with a clean bag, and then once they got beyond customs they would switch out the bag with the bag containing the drugs. So I think that in this instance there was absolutely no connection between that September 20, 2003 drug seizure to the particular conspiracy that was charged in this case. Well, the co-conspirator, Claxton, challenged his knowledge of the object of the conspiracy in a related case. You're equating with U.S. v. Claxton. Yes, yes. That's a case in which I dissented, but he shouldn't be found guilty. Yes, but I'm not talking yet, I'm not yet talking about the sufficiency of the evidence as it pertains to the conspiracy charge. I'm just talking about the court's decision to admit that drug evidence into the case. Well, yeah, but once that's in the case, if it's properly within the case, you also object to the sufficiency of the evidence. Of course, yes, yes I do. And on the exact same evidence we convicted, I object to the Senate, but the panel convicted your co-defendant on the exact same evidence. Well, when you say the exact same evidence, you know, I would like to point out that what the court said in the Claxton case was that the co-conspirator, Isaac, you know, basically identified Mr. Claxton. He basically gave some testimony, and I think that, well, the distinguishing point for me is that here, Mr. Kerry Woods was never truly identified as a member of this conspiracy. Yeah, but the facts in Claxton are exactly the same as the facts in this case, and the admission of the evidence was the same. I agreed with you, and I went down the drain in that case. So where you go into this case, you have the exact same, and not only that, but since that case is decided, the Third Circuit has now made it more difficult for a defendant to make that argument. In my opinion, even in light of the Caraballo-Rodriguez decision, the door isn't completely shut on my client, because I think my client, you know, stands a little differently from even Mr. Claxton. My client, during the course of the trial, there were pictures that the government bandied about showing all these different individuals who are a member of this conspiracy. They refer to them being on the farm and all this sort of stuff. There was none of that evidence as it pertains tying my client into this. My client was not depicted in any photographs. I'm sorry, my client was not depicted in any photographs. My client was not seen at the farm or anything. Mr. Isaac never, and this is important, Mr. Isaac testified to seeing each and every, well, I don't mean to throw everybody under the bus, but Mr. Isaac never said that he saw my client at the farm. He never said that. So all we have is that Mr. Isaac indicated that when he received a phone call from Mr. Freeman and Mr. Freeman supposedly said that he was going to be sending someone by the name of Parba, that Parba would be coming with a bag, and that this person was ultimately identified as Mr. Kerry Woods. He didn't have, when Mr. Kerry Woods came up there to North Carolina, he surrendered the bag. Mr. Isaac took the bag and went somewhere else in another room and supposedly opened the bag. On the second instance, in June of 2004, June of 2005, he indicated that Mr. Kerry Woods came up to North Carolina and met with somebody else where this exchange took place. So coming into with respect to the court's new holding with respect to sufficiency of the evidence, what I would like to say is that, you know, here we never have anything other than the control and dominion that the court talks about with respect to him having a bag that we can somehow perhaps infuse some knowledge of the contents. Other than that, I take note of that, but other than that, there's nothing showing that Mr., I mean, who's to say that Mr. Kerry Woods did not believe that the bag contained money, just as Alexis Wright. Ms. Wright testified that the only thing she knew about the bag she was carrying was that on one instance she was told that she was carrying $200,000. My client likewise sort of believed that what he was carrying was money. The government did not produce any other evidence other than the testimony of Mr. Isaac or the testimony of Ms. Wright. And I would like to address some of the other issues before all my time runs out. But Isaac talked about your client going to a specific location where they interacted with other members of the conspiracy and they talked about drug-related activities. Not Mr. Woods. I would like the court to point me to. Not Mr. Woods. Not Mr. Woods. I would like the court to point me to that. I thought that there was some evidence of that. Not with respect to Mr. Woods, no. My client said it was associated with drug dealers. They were associated with them somehow. Perhaps, but there was no testimony indicating that Mr. Woods associated himself with the other co-defendants other than the testimony that he carried these bags to the mainland. I want to get back to your point about the 2003 seizure. One of the requirements that the government had was to prove the existence of the conspiracy. Correct. And as that the existence of the conspiracy was important to prove as to all defendants. So wasn't that certainly that testimony about the 2003 seizure was probative? And under 403, there's a presumption that the probative value, that there's probative value. And if the district court properly found that it outweighed any prejudice to your client, wasn't it properly admitted? In Lefkoe v. U.S., 1934 case, the Supreme Court said, you know, in a conspiracy charge, evidence that established another conspiracy cannot be used to support a guilty voting. Here in this instance, I think that everything, the government's own evidence, flies against any inkling or any idea that these drugs could have been attributed to the defendants in this instance. Every shipment included, every shipment involved only 10 kilograms, 10 kilograms, each instance. Again, it was always carry-on luggage, never checked luggage. The government's evidence of the seizure was that it was 20 kilograms. I think it was 16 kilos, weighing 20-point-something pounds or something like that. But it was twice what the defendants in this instance, or it was twice what the testimony was that was being transported by these individuals on each occasion. So I think although it could have some probative value, in this instance, the evidence clearly, the drugs in question could not be tied to the conspiracy charge in this case. And therefore, it was totally improper for the court to admit that evidence in. And I think by way of my letter brief, I addressed the court's concerns with respect to Caravalo Rodriguez. I don't think that the door is shut on my client 100 percent. I think that has been narrowed significantly. All right. Okay, I'll reserve my two minutes. Thank you. Thank you very much, Mr. John Baptiste. And Mr. Jones? Please call Nelson Jones for the United States. With respect to the claim that there was no evidence that the cocaine seized at the airport on September 2003 was part of a conspiracy, I refer the court to the transcript in which Isaac testified that he was advised by the co-conspirator, Mark, that the cocaine that was seized on September 20, 2003 belonged to their organization and was intended for distribution by Isaac. And that is found in the Joint Appendix Volume 2, pages 483 to 484. So there was clear evidence by a co-conspirator that, in fact, another co-conspirator had advised him that the drugs seized at the airport were, in fact, owned by the organization and that they were being delivered to Isaac for- What specific evidence is there in this record that Woods knew that the object of the conspiracy was cocaine as opposed to some other contraband? You have to show that he knew he was transporting cocaine. We have to show that he knew he was- Well, basically, with the court's decision in Caraballo-Rodriguez, what the Third Circuit has said is once a jury has made a determination, has returned a verdict based on the evidence presented, the Third Circuit will not go behind that verdict to make a determination whether, in fact, there was a basis for it. Yeah, but it's got to be rational. The jury has to rationally find that he knew he was dealing with cocaine. What evidence here- I'm not rewriting Claxton, do you understand me? I'm talking about the facts in this case. Well, you have the testimony of Mr. Isaac, who testified that Mr. Woods was a part of the conspiracy, that Mr. Woods was a member of the organization, the testimony of Co-Conspirator Isaac, that, in fact, he met with Mr. Woods when Mr. Woods brought the cocaine to him, 10 kilograms, that he sent Ms. Alexis Wright to pick up Mr.- Yeah, but what evidence showed that he knew that what he got was cocaine, or what these people were dealing with cocaine? But he was the one who transported it from St. Thomas to North Carolina. But he never saw it. He had to see it. He went through customs with it. He went through the airport here in St. Thomas, left the airport in St. Thomas with the drugs. That's true, but there's no evidence that he knew it was cocaine. Well, that's a question for the jury, and a jury made a determination that, in fact, he knew it was cocaine. How did they know it was cocaine? How did a jury make that determination? Rationally, how could they find that he knew it was cocaine that he was transporting? And not some other- even other contraband or something? Based on the testimony of Mr. Isaac, that Mr. Woods was, in fact, a member of the organization, that Mr. Woods was, in fact, a Co-Conspirator in this organization as far as the dealing of cocaine through the airport in St. Thomas, the jury was authorized to make a rational inference that, in fact, Mr. Woods knew what he was doing. Didn't Isaac say he delivered it and received $5,000 in return? Yes, that's what I indicated, that Isaac testified that, in fact, Mr. Woods brought the cocaine to North Carolina and that gave it back to Mr. Isaac, and Mr. Isaac, in turn, gave him $5,000. Okay, I don't want to beat a dead horse here, but that's true. He knew he was getting a lot of money to do something, but don't you have to prove that he knew what he was doing was cocaine? That was the object of the conspiracy, one of the four things which is required to be proved beyond a reasonable doubt. What in the record shows that he knew he was getting $5,000 to transport cocaine vis-à-vis marijuana? And we submit to the court that, based on what's covered by Rodriguez, it doesn't make a difference whether he thought it was cocaine or marijuana, as long as the jury is satisfied that, in fact, he knew it was cocaine, based on the testimony that was presented to the jury. And we submit that, based on the fact that Mr. Isaac has testified that Mr. Woods was a member of the conspiracy, that Mr. Woods did, in fact, bring cocaine from the Virgin Islands to North Carolina, did deliver the cocaine to Mr. Isaac, that he was paid $5,000 for that, and that, in fact, he was advised by another member of the conspiracy that, in fact, Mr. Woods would be delivering cocaine to him, and, in fact, Mr. Woods did that. We submit that gave the jury the authority to draw a reasonable inference that, in fact, Mr. Woods knew that he was delivering cocaine to Mr. Isaac. With respect to the – I can't remember whether I dealt with the September 20th issue concerning the cocaine, and the fact that the cocaine seized at the airport on September 20th, 2003, Mr. Isaac testified that in conversation with Mr. Mark, that Mr. Mark advised him that, in fact, that cocaine was intended for distribution in North Carolina by Mr. Isaac, and that that cocaine belonged to an organization. And, therefore, as part of the conspiracy, and as far as the proof that the government had to present to the jury to establish the conspiracy, we submit that that evidence was properly used. Mr. Jones, let me ask you a question that Mr. John Baptiste didn't touch on, but it's in his brief. The question about the contact with Juror 125 and Juror 159, their argument is – and it's raised by another one of the defendants – but the argument was that the district court should have interrogated all of the jurors to make sure that there hadn't been any – that they didn't become notified that someone tried to tamper with Juror 125. What do you say to that argument? I disagree. The government's position is that the court did exactly what was required for it to do. That is, it made a determination after speaking to both jurors – I believe it was 159 and 125 – whether they had any other contact with any other members of the jury, and they both indicated there was no need to go any further. Well, you don't have to believe what they say. You don't know whether there's taint or not unless you also interrogate the balance of the panel. I mean, they could have said that because they didn't want to get involved anymore. But I think – why did he have an obligation to speak to the rest of the panel to see whether they were tainted with the knowledge? I think that the district court was trying to keep from involving the rest of the jury unnecessarily. That is, if the court is satisfied that the responses it has received from the two suspected jurors, that is, 159 and 125, that there was no further contact with any other juror, I submit to the court that, therefore, the court was correct. So he's got to take their word for it, right? Even though he could verify whether they were correct or not by asking the balance of the panel. He's got to take their word for it. Correct. Well, I might not buy that. Why does he have to take their word for it? He could have verified whether there was any taint by just simply asking the balance of the panel. Does anyone speak to you about any hanky-panky here? And it then would have raised the specter of involving itself in the other juror's business. The bottom line is that he asked the two particular jurors who were involved, and the other jurors also had an affirmative duty if they had had any unlawful contact or any contact concerning the case, to advise the court, and no one else did. But the concern is, and I think the one I ask about and Judge Cowens expressed any concern about is, you know, 125 admitted she told brother, sister, and aunt, who happened to be 159. Correct. Over the period of time in which she continued to be part of that jury, I mean, if she said anything about this alleged jury tampering, that's a very prejudicial information, because if, in fact, somebody's trying to tamper with the jury, there's a strong presumption that these guys must be guilty or they wouldn't be trying to pressure the jury. And it's almost like a reaction the other way that, well, we'll show these guys. Well, I mean, it's just a question that's so basic and fundamental, I wonder what the right way to go here is. And that's why I'm asking you for some guidance. Did the district court do it the right way? I think the district court did, Joe. By just taking their word for it. By questioning them concerning their involvement and what was told to them and what they had done subsequent with that information. And the fact remains that 125 came forward to the court herself. Just as any other jury was required to do if they had had any unlawful contact or unauthorized contact. And no other jurors, other than 125 and 159, reported it to the court. In essence, what you're saying is the backlash could have been worse if they had a voir dire of all the jurors. Correct. Well, the backlash was the district judge's job to do. That's what we hire him for, isn't it? I understand the job, but it's also the job of the district court judge not to invade the province of the jury. All right, Mr. Jones. Thank you very much. Mr. John Baptiste. Yes, Your Honor. I want to thank the justices for kind of raising the jury issue because I didn't get a chance to do so today. So I did want to point out that the Third Circuit and U.S. State Council pointed to just this type of instance where it's deemed the most serious nature where there's contact between a third party and a juror. And this is one of the rare instances where you can have a presumption of prejudice. And as I indicated in my brief, I thought that it would have been more appropriate for the court to inquire of the entire jury panel and stuff to see if indeed there was any contact, if juror 125 or even 159 had passed on what had happened to them. So I think that in this instance, the more appropriate thing for the court to have done down below was to have inquired of the other jurors. And the government just indicated that the sanctity of the jury, not wanting to invade the province of the jury. But let's not forget the rights of my client, the defendant's rights to a fair trial. So I think that perhaps my client's rights should prevail over the court's concerns over the jury. I certainly feel so. Now, going back with respect to Attorney Jones indicated that there was a direct testimony on the record that the September 20, 2003 seizure was the drugs of the conspiracy trial in this case. But actually the testimony of Mr. Isaac was that he had received a telephone call from, or he had spoken to Mr. Mark. And Mr. Mark indicated that, one second, that he would be sending another shipment because a September seizure had occurred. Now, he didn't indicate that the September 20, 2003 seizure was his drugs. But he did in fact indicate, Mr. Isaac indicated that Mr. Mark had indicated that he had some drugs that he lost by virtue of a seizure in September. Now, the government didn't come forward and indicate that there were no other seizures in September of 2003. The government didn't present that sort of testimony. But I think that it would require a stretch for the court to believe that just based on Mr. Isaac's self-serving testimony, that this seizure that Mr. Mark told him about was in fact the September 20, 2003 seizure. Now, with respect to just, not to beat a dead horse, but just going back to Caraballo-Rodriguez, I think it's a fact-specific inquiry that the court has to undergo here. And I think looking at all of the evidence produced and all of the evidence as to Mr. Woods is just simply the testimony of Mr. Isaac and the testimony of Ms. Wright. Ms. Wright only adds that she met Mr. Woods on three different occasions. She doesn't say anything about her knowledge of what's in the bags or anything. And Mr. Isaac simply indicates that on one occasion, he obtained a bag from Mr. Woods. And, in fact, that he did, in fact, pay him $5,000. But he didn't say. The testimony wasn't that he paid him $5,000 in exchange for the drugs that he gave him. He just paid him $5,000 once he got the bag. The second instance, again, in June, was that the bag was delivered to some other top person and that— Well, you don't get $5,000 for delivering a bag unless there's something in the bag. But this circuit's a case that basically says that the government has to be able to produce evidence that, you know, it's a conspiracy. The agreement was to possess with intent to distribute cocaine. Well, all the evidence in this case was that your client, Mr. Woods, was involved in this big-time cocaine drug conspiracy. Isn't that a reasonable inference for the jury to draw? Well, once we take away the incorrect admission of the September 20, 2003 drug evidence, I don't think so. I don't think so. I mean, like I pointed out earlier, it could very well have been bags of money that was being transported. We don't know. And at that point, the government also indicated that Mr. Woods went through customs with these bags, so he must have known that drugs wasn't there. The government's own evidence was that the bags came in through the courier, through the airport, with, you know, clean bags, no drugs in there. And that subsequent to clearing customs, the drug bag, you know— I think that's what he meant. So I think that if that's the case, it removes the opportunity for Mr. Cherry Woods because he would not have had that bag until he got into the protected area beyond customs. So it removes the opportunity for him to learn, you know, indeed what's in the bag because he didn't arrive at the airport. But under Mark's methodology, he also testified that the bag that he ended up carrying with him was a bag that somebody on the inside brought in with cocaine. So all of these facts are facts from which a jury could properly draw an inference that the bag that Mr. Woods carried, for which he got $5,000, was a bag of cocaine. Yes, but he had to enter into an agreement for a specific purpose, which is conspiracy to possess with intent to distribute cocaine. So, yes, all of this other evidence, you know, comes into the mix as well. But there has to be some evidence for us to know that he had the specific intent required, knowledge that it was—the conspiracy was to possess with intent to distribute the cocaine. Okay. All right. Thank you, Mr. John Baptiste. We thank both counsel for excellent arguments.